UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RALPH STRUMOLO and DONNA STRUMOLO,<br><br>       Plaintiffs,<br><br>v.<br><br>STEELCASE, INC., et al.,<br>       Defendants. | Civ. No. 13-1932 (KM) (MAH)<br><br>OPINION |

**MCNULTY, U.S.D.J.:**

  One day at work, plaintiff Ralph Strumolo sat down in an adjustable office chair which suddenly lowered by about five inches, allegedly injuring him. The cause of the accident, according to Mr. Strumolo, was premature wear to the O-ring inside the pneumatic cylinder that controls the chair's height adjustment. Mr. Strumolo and his wife, Donna Strumolo,[1] have brought this action against his employers, Dish Network Service Corp., Dish Network L.L.C., Dish Network Service L.L.C., and Echostar Corp. (together, "Dish Network"); the manufacturer of the chair, Steelcase, Inc. ("Steelcase"); and the manufacturer of the pneumatic cylinder, SUSPA, Inc. ("SUSPA"). The plaintiffs seek damages under New Jersey's Products Liability Act ("PLA"), N.J. Stat. Ann. § 2A:58C-1 et seq., and also assert causes of action for breach of warranty, breach of employment contract, and loss of consortium.

  At the close of discovery, Magistrate Judge Michael A. Hammer set a briefing schedule for dispositive motions on the issue of liability. Now before the Court are the motions for summary judgment on liability filed by Strumolo, Steelcase and SUSPA (Dkt. Nos. 107, 108, 110), but not Dish Network. For the reasons set forth below, the motions are granted in part and denied in part.

---

[1]  For simplicity, this opinion will treat Ralph Strumolo as plaintiff. As the context requires, Donna Strumolo will be identified specifically.

## BACKGROUND

### A. The Accident

Plaintiff Ralph Strumolo was employed as a call center representative for Dish Network at the Pine Brook, New Jersey office. (Plaintiff's Statement of Material Facts Not In Dispute, Dkt. No. 110-20 ("Strumolo SOF") ¶ 4) He worked in their sales department, selling and marketing Dish Network's television and internet services. His hours ranged from forty to forty-four hours a week, split into 11-hour shifts over four days. Mr. Strumolo generally worked seated at a desk. (Decl. of Scott Haworth in Support of Steelcase Inc.'s Motion for Summary Judgment, dated Feb. 26, 2016, Dkt. No. 108-1 ("Haworth Decl."), Ex. A (Tr. of Deposition of Ralph Strumolo, dated Dec. 20, 2013 ("Strumolo Dep. Tr.")) 12:20-13:5, 51:14-16)

The sales team was located on the second floor of the Pine Book office. Team members did not have their own cubicles. (*Id.* at 51:20-52:5, 55:21-56:15) Instead, at the start of each shift, the floor manager or team coach would assign each team member to a seating area. (Strumolo Statement of Material Facts Not In Dispute, Dkt. No. 110-20 ("Strumolo SOF") ¶ 10) No particular chair was associated with a specific cubicle; rather, team members were free to choose any available chair for use during their shift. Broken or discarded chairs were placed in one corner. From time to time, an employee might select one of those broken or discarded chairs. (Steelcase Inc.'s Statement of Undisputed Material Facts, Dkt. No. 108-13 ("Steelcase SOF") ¶¶ 22, 23)

On December 12, 2012, Mr. Strumolo reported for work around 9 am for the shift beginning at 9:30 am. (Strumolo Dep. Tr. 15:8-13) After obtaining his assignment from the floor manager, Strumolo chose a cubicle within his seating area. That cubicle happened to already have a chair inside. It was a height-adjustable desk chair, with a black back, red seat, armrests, and a lever below the seat which could be used to adjust the height. Strumolo noticed nothing unusual about the chair. (Strumolo Dep. Tr. 58:9-12, 75:17-21) He sat down, placing his full weight on the seat. Immediately, the chair dropped five

inches, with Strumolo remaining fully seated. (*Id.* 69:14-22; Strumolo SOF ¶¶ 16, 19) After he rose from the chair, he observed that the chair seat rose to its maximum height.

Strumolo's supervisor, Seth Spooner, happened to be walking by following the incident. Strumolo informed Spooner that the chair had "collapse[d]" and that he felt lower back pain. (Strumolo SOF ¶¶ 21, 22) Spooner removed the chair from the cubicle and tested it by putting his knee on the seat, which descended rapidly. (*Id.* ¶¶ 26-28) The maintenance supervisor, Delio Olivo, was notified that the chair was broken. (*Id.* ¶¶ 31, 32) Mr. Olivo put the chair in the area where the other broken chairs were kept, and upon later inspection, determined that he could not fix it. (Declaration of Delio Olivo, dated Sept. 20, 2013 (Dkt. No. 110 Ex. O) ¶¶ 9-11) Olivo eventually discarded the chair. (*Id.* ¶ 12)

Following the incident, Strumolo experienced lower back pain and had to leave work early. (Strumolo SOF ¶ 35) He attempted to return to work in the following weeks, but found that he was in too much pain. He alleges that, as a result of the accident, he suffered severe and permanent back injuries which have required two surgeries, physical therapy, and pain management medication. He has been out of work and on workers' compensation benefits since the incident.

**B. The Chair**

The specific chair involved in the accident was discarded and cannot be found. Mr. Strumolo was able to provide a description of the chair sufficient to identify it as a Model 453 Criterion, manufactured by Defendant Steelcase in 1997. (Strumolo SOF ¶¶ 43-48) IBM, the occupant of the Pine Brook offices before Dish Network, had bought a number of chairs from Steelcase in February 1997. (Steelcase SOF ¶¶ 16, 18) When Dish Network took over the facility, it acquired the chairs as a hand-me-down from IBM. The office chairs at Dish Network were used continuously, for three shifts a day. (*Id.* ¶ 20)

The Model 453 Criterion chair featured a castered rolling base, swiveling chair frame and height adjustment lever. (Steelcase SOF ¶ 27; Haworth Decl. Ex. J (Expert Report of Erick Knox, Ph.D., dated Sept. 14, 2015 ("Knox Report")) p. 10) The frame of the chair is attached to the base through a single central pedestal. Inside this pedestal is the height-adjustment mechanism, a pressurized pneumatic cylinder. The pneumatic cylinder was manufactured by defendant SUSPA. (Steelcase SOF ¶ 34; Decl. of Shaun Blick in Support of Plaintiff's Motion for Summary Judgment, dated February 26, 2016, Dkt. No. 110-2 ("Blick Decl.") Ex. F (Deposition of Jack Breneman, dated Nov. 18, 2014 ("Breneman Dep. Tr.") 29:22) The cylinder contains two chambers, separated by a seal, known as an O-ring, and a valve. The cylinder operates to lift and lower the seat by the movement of gas between the chambers, activated by the hand lever located below the seat bottom. The cylinder is sealed, under high pressure, and cannot be accessed or opened by the user of the chair.

The pneumatic cylinder is mounted onto a central rod which rests on a thrust bearing in the seat base. The thrust bearing allows the chair frame and attached cylinder to swivel as a unit. If the thrust bearing does not rotate freely, the sitter's rotation of the seat could force the cylinder itself to rotate around the central rod, which could lead to wear on the O-ring inside the cylinder. (Strumolo SOF ¶ 117; Blick Decl. Ex. G (Deposition of David Atwater, dated Nov. 19, 2014 ("Atwater Dep. Tr.") 41:14-44:8) A worn O-ring can lead to gas leaking between the two chambers within the cylinder without the use of the lever. That shift in pressure could result in the seat of the chair lowering rapidlywhen a user sits in the chair. (*Id.*) The thrust bearing used in the Model 453 Criterion chairs was a plastic thrust bearing. At some point in the fall of 1997, Steelcase switched to using a steel ball bearing. (Strumolo SOF ¶¶ 108, 115)

Both sides engaged experts. Plaintiffs' expert, Gary L. Jackson, issued a report on February 10, 2015, and was deposed on September 18, 2015. (Haworth Decl. Exs. I (Deposition of Gary Jackson, dated Sept. 18, 2015 ("Jackson Dep. Tr.") and K (Expert Report of Gary Jackson, dated February 10,

4

2015 ("Jackson Report") Mr. Jackson based his report on the examination and testing he had conducted of other Steelcase chairs with the same model and period of production as the chair at issue. He performed those tests in 2003 in connection with a separate case. (Jackson Report p. 3) Jackson opined that the only possible cause of the chair's failure was a failure of the O-ring. (*Id.* p. 4) Accelerated wear, according to Jackson, occurred when the inner tube of the cylinder rotated around the piston rod, and that rotation occurred because of a failure of the thrust bearing. Jackson opined that a steel ball bearing, as opposed to a plastic thrust bearing, should have been used. That design modification, he said, would have reduced friction on the rotation axis and prevented the failure that occurred here. (*Id.* pp. 4-5) Jackson opined further that the chair should have had a hang tag affixed to it, warning users that if the chair exhibits a slow sinking behavior, it should be repaired or discarded. (*Id.* p. 6)

Steelcase's expert, Erick H. Knox, Ph.D., submitted a report dated May 5, 2015. Dr. Knox concluded that Mr. Strumolo "appear[ed] to have sat down in a chair that had a worn out pneumatic cylinder." (*Id.* p. 17) Dr. Knox submitted four exemplar Model 453 Criterion chairs to swivel testing using a 300 pound weight and to seat durability testing using a 220 pound weight. He found that the chairs had an expected service life of 15 years, but did not exhibit a sudden drop like that experienced by Mr. Strumolo for the equivalent of 60 years. (*Id.* pp. 10-12, 17)

Strumolo alleges that Steelcase and SUSPA were on notice of problems with the chair. Specifically, after receiving customer complaints, the Defendants conducted a joint study of piston O-ring wear to determine the cause of chair failures. (Blick Decl. Ex. H (Deposition of James Vander Zanden, dated Nov. 19, 2014 ("Vander Zanden Dep. Tr.")) 34:10-15) That study concluded that premature O-ring wear resulted when "the bearing system didn't operate as it should and the inner and outer tubes were allowed to rotate around the piston." (*Id.* 35:8-12) No design changes were made to the cylinder

itself, but Steelcase and SUSPA did decide to switch to a steel ball thrust bearing. (*Id.* 35:12-37:10) Steelcase's senior quality engineer, Mr. Breneman, testified about customer complaints that had been received. The complaints, he said, related to "failures" that for the most part were "slow sinker scenario[s], where somebody would sit in the chair all day and it would slowly drop." (Breneman Dep. Tr. 102:20-24) It was "rare," according to Breneman, to receive a complaint of a sudden drop; he estimated that there had been approximately 20 such complaints from 1996 to the present, a period in which approximately 6 million or these 453 Criterion chairs were manufactured. (*Id.* 52:10-21, 53:13-54:10, 115:23-116:3) After the switch to a steel ball bearing, Breneman testified, the number of complaints dropped, but the switch "didn't solve" the issue completely. (*Id.* 103:6-7) There were no recalls of the chairs or pneumatic cylinders, and no warnings were affixed to either the chairs or the pneumatic cylinders regarding the risk of failure or potential injury. (Strumolo SOF ¶ 133)

### C. Procedural History

Mr. Strumolo and his wife filed a complaint in the Superior Court of the State of New Jersey, Law Division, Morris County, on March 14, 2013. (*See* Dkt. No. 1) Defendant Steelcase removed the action to this Court on March 27, 2013, pursuant to 28 U.S.C. § 1441(a), citing this Court's diversity jurisdiction. An Amended Complaint was filed on June 19, 2014. (Dkt. No. 60, 64) The complaint asserts six causes of action. The causes of action against Steelcase and SUSPA sound in products liability for defective design and failure to warn (Count 1), breach of warranty (Count 3), and, on behalf of Mrs. Strumolo, loss of consortium (Count 5). The latter two causes of action are not at issue in these motions for summary judgment, which are directed at liability on the product liability claims.

### JURISDICTION AND APPLICABLE LEGAL STANDARD

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332, as there is complete diversity between the parties and the amount in controversy exceeds $75,000. These motions are therefore governed by the Federal Rules of Civil Procedure.

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000).

In determining whether there is a "dispute as to any material fact," In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of

material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In determining whether a party is "entitled to judgment as a matter of law," in this diversity case I must apply State substantive law. *See generally Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817 (1938). That requires me to determine how the State's highest court has decided, or predict how it would decide, the applicable legal issues. Of course, a decision on point by the New Jersey Supreme Court is best. *See Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 220-21 (3d Cir. 2008).

> But "in the absence of guidance from the state's highest court, [I] must look to decisions of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue," as well as to "analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would determine the issue at hand."

*Norfolk Southern Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 92 (3d Cir. 2008) (quoting *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1445 (3d Cir. 1996)); *see also West v. AT&T Co.*, 311 U.S. 223, 237 (1940); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007).

## DISCUSSION

### A. Product Liability Act

Strumolo's product liability claims are brought under New Jersey's Product Liability Act ("PLA"), N.J. Stat. Ann. § 2A:58C-1 *et seq.* Under the PLA, a "manufacturer or seller of a product" is liable

> only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.

8

N.J. Stat. Ann. § 2A:58C–2.

Thus the PLA recognizes three categories of claims: manufacturing defect, design defect, and failure to warn. *See Roberts v. Rich Foods, Inc.*, 654 A.2d 1365, 1370 (N.J. 1995); *Dziewiecki v. Bakula*, 824 A.2d 241, 246 (N.J. Super. Ct. App. Div. 2003). Strumolo does not assert a manufacturing defect claim, but does assert claims of design defect and failure to warn.

### B. Design Defect

In design defect claims, a plaintiff must prove "(1) the product was defective; (2) the defect existed when product left the hands of the defendant; and (3) the defect proximately caused injuries to the plaintiff; and (4) the injured plaintiff was a reasonably foreseeable user." *Boldman v. Wal-Mart Stores, Inc.*, 2016 WL 2347039, at *4 (D.N.J. May 4, 2016) (citing *Myrlak v. Port Auth. of N.Y. & N.J.*, 723 A.2d 45, 52 (N.J. 1999)); *Jurado v. Western Gear Works*, 619 A.2d 1312, 1317 (N.J. 1993).

A product is defective when it "[is] not reasonably fit, suitable or safe for its intended purpose." *Cornett v. Johnson & Johnson*, 998 A.2d 543, 562 (N.J. Super. Ct. App. Div. 2010) (citing N.J. Stat. Ann. § 2A:58C-2). The fact that an accident occurred is not, by itself, sufficient to establish this element. *Scanlon v. General Motors Corp.*, 326 A.2d 673, 677 (N.J. 1974) "To prove both the existence of a defect and that the defect existed while the product was in the control of the manufacturer, a plaintiff may resort to direct evidence, such as the testimony of an expert who has examined the product, or, in the absence of such evidence, to circumstantial proof." *Myrlak*, 723 A.2d at 52 (citing *Scanlon*, 326 A.2d at 677-78). The evidence must permit an inference of probability, rather than mere possibility, that the product was unfit for its intended purpose. *Jakubowski v. Minn. Mining & Manuf.*, 199 A.2d 826, 830 (N.J. 1964).

#### 1. Age and usage of the product

The age of a product is often relevant to the determination of whether the plaintiff has established a prima facie case. Here, it is a critical issue. It is undisputed that the chair involved in Mr. Strumolo's accident was

manufactured in February of 1997 and shipped to IBM in March 1997. At the time of the accident in December 2012, the chair was thus approximately 15 years and 9 months old. Mr. Jackson, plaintiff's own expert, testified that 15 years is a reasonable useful life span for such a chair.[2]

Of course, Jackson made that statement in the context of also opining that the wear of the O-ring was accelerated. Because this particular chair was discarded, no examination was made of the actual O-ring involved. The expert opinions and other evidence, then, relate to similar or typical chairs, not to the particular one Mr. Strumolo sat in; the analysis necessarily occurred at some level of generality. Steelcase stresses that the O-ring wear (assuming that occurred) cannot be considered "accelerated" when a product has already exceeded its expected useful life span. In essence Steelcase's argument is this: Nothing lasts forever. The O-ring may have worn out, but it lasted as long as expected. That it eventually wore out does not imply that there was a defect in the chair when it left Steelcase's hands.

Indeed, proving that a defect existed when the product left the hands of the manufacturer is "particularly difficult" when a product is old and, as here, there is no direct evidence that any defective condition existed when the manufacturer sold the product. *See, e.g., H.T. Rose Enters., Inc. v. Henny Penny Corp.*, 722 A.2d 587, 595 (N.J. Super. Ct. App. Div. 1999); *see also Scanlon*, 326 A.2d at 678 ("Generally speaking, the older a product is, the more difficult it is to prove that a defect existed while in the control of the manufacturer.") The test, then, is whether the circumstantial evidence supports a reasonable inference that it is more likely than not that the defect existed prior to sale.

---

[2] Plaintiffs dispute this and cite Steelcase's expert report, which states that Model 453 Criterion chairs successfully endured testing for multiples of the 15-year lifespan, meaning the chairs could last for 45 or 60 years. That some chairs exceed expectations does not undercut the general point that the useful life of the chair is 15 years. In short, the data show that the chairs could last longer than 15 years, not that they necessarily would. Moreover, it is undisputed that Dish Network employees used the chairs for three shifts a day. Although I do not rest my decision on this factor, a finder of fact could conclude that these particular chairs thus received more intensive use than is typical; offices, as opposed to, *e.g.,* certain factories, more typically operate for one or two shifts per day.

*H.T. Rose,* 722 A.2d at 595. Stated differently, what is required is "proof sufficient to support a conclusion that 'in the normal course of human experience an injury would not have occurred *at this point in the product's life span* had there not been a defect attributable to the manufacturer.'" *Id.* (emphasis added).

The New Jersey Supreme Court has counseled that a product's age, prior usage, expected life span, durability, and operation without maintenance are "important considerations in determining whether [that] inference is permissible." *Scanlon,* 326 A.2d at 678; *see also Navarro v. George Koch & Sons, Inc.,* 512 A.2d 507, 517 (N.J. Super. Ct. App. Div. 1986) (dismissing manufacturing and design defect claims against oven latch manufacturer where evidence demonstrated that latches had been used daily for six years and had been maintained minimally, if at all, finding that it could not reasonably be inferred that the alleged defect existed while the product was in the control of the manufacturer).

On these issues, *Jakubowski v. Minnesota Min. & Mfg.,* 199 A.2d 826 (N.J. 1964) is instructive. That case involved sanding discs sold to Ford Motor Company for use in finishing auto bodies. An employee was injured when the disc he was using broke in half and struck him in the stomach. He sued the disc manufacturer alleging breach of warranty. The discs were typically used five times before being discarded, and they broke often, but were used anyway because of their low cost. Thus the Court explained "while it is possible that the disc broke because of a manufacturing flaw or because the design was inherently inadequate for rough snagging operations, it is just as possible that mishandling by the prior user or users or use beyond the expected life span of the disc was responsible." 199 A.2d at 830. In determining which way the inference went, the Court noted "[i]t is common knowledge that materials subject to friction will eventually wear out." *Id.* Thus, said the Court, if a company decides to use a product beyond the product's useful life, liability will not lie with the manufacturer unless there is evidence presented that the


manufacturer somehow agreed to such usage. *Id.* In *Jakubowski*, there was no evidence that employees complained to the company, or that the company complained to the disc manufacturer, about disc breakage. Accordingly, the Court found that "Plaintiff has failed to introduce any evidence from which it is reasonable to infer that the expected useful life of the disc had not been exhausted at the time it broke." *Id.*

Here there is not, as in *Jakubowski*, a mere absence of "evidence ... that the expected useful life of the [chair] had not been exhausted" in December 2012. The chair in which Mr. Strumolo sat was concededly over fifteen years old, and his own expert agreed that fifteen years is a reasonable useful life for such a chair. The evidence indicated that this chair, like other similar ones in the office, had been used continually, perhaps nearly continuously, since it was manufactured. There is no evidence that Steelcase knew about or acquiesced in the heavy usage of the chairs or in Dish Network's (alleged) practice of using the chairs until they broke.[3] The fact that an O-ring wore out after fifteen years and nine months, without more, would not permit a reasonable fact finder to conclude that there must have been something wrong with the chair when it left the hands of Steelcase.[4] It is possible that that was the case, but the standard is probability, not mere possibility.

That may be enough to defeat a prima facie case of design defect, but I go on to consider other risk-utility factors.

---

[3]  And beyond. There is evidence that employees routinely selected chairs from the broken chair area. I do not, however, make any ruling or finding as to Dish Network, which has not filed a summary judgment motion or presented its side of the story.

[4]  I note that in a similar case against Defendants arising from the sudden collapse of a chair (and using the same experts), summary judgment was denied for Steelcase on the grounds that evidence was presented from which a reasonable juror could conclude that the chair malfunctioned owing to a defect. *See Nichols v. Steelcase, Inc.*, 2005 WL 1862422 (S.D. W.Va. Aug. 4, 2005). That case, however, is highly distinguishable. There, as here, Steelcase argued that the chair was subject to heavy wear and tear. The Court found that the plaintiff's experts had refuted that contention, and it was also undisputed that the chair was only six years old at the time of the accident. Different facts, different result.

## 2. Other risk-utility factors

In seeking to establish that a product is defective a plaintiff "must prove under a risk-utility analysis the existence of an alternate design that is both practical and feasible," and "safer" than that used by the manufacturer." *Diluzio-Gulino v. Daimler Chrysler Corp.*, 897 A.2d 438, 441 (N.J. Super. Ct. App. Div. 2006) (citing *Lewis v. American Cyanamid Co.*, 715 A.2d 967, 980 (1998)). The "risk-utility analysis is appropriate when the product may function satisfactorily under one set of circumstances, yet because of its design present undue risk of injury to the user in another situation." *O'Brien v. Muskin Corp.*, 463 A.2d 298, 304 (1983) (setting forth a seven factor risk-utility analysis).[5]

Defendants argue that Strumolo has failed to present an alternative design that is practical, feasible and safer. Strumolo contends that he has identified three: (1) a Twist-O-Matic design, (2) a large lead screw, or (3) a steel ball bearing. Any of these designs, he says, would have eliminated the risk that the chair would suddenly drop.

---

[5] The seven factors are:

(1) The usefulness and desirability of the product – its utility to the user and to the public as a whole.

(2) The safety aspects of the product – the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*O'Brien*, 463 A.2d at 304-05.

The first two designs do not present a substantial issue of practicality or feasibility. As Mr. Breneman testified, the Twist-O-Matic is a *manual* height adjustment mechanism in which it was "labor intensive to adjust your chair" and the chair "wasn't as comfortable" as a pneumatic chair. (Breneman Dep. Tr. 105:13-17) While such a design might reduce risk, it would not be the same chair.[6] Indeed, Breneman went on to state that Steelcase stopped producing the Twist-O-Matic because "nobody wanted" to buy it. (*Id.* 105:17-21) Although the cost of production of the Twist-O-Matic and the pneumatic cylinder chairs might be the same, it is not practical for a company to confine itself to a chair that no one is interested in buying. As for the large lead screw, Mr. Atwater testified that this was the technology used in the 1950s. (Atwater Dep. Tr. 89:7-9) Atwater "ha[d] no idea" whether that design would have reduced the risk of sudden seat dropping. (*Id.* 89:14) No other evidence is presented regarding this alternative design; it has not been established that this apparently obsolete alternative is practical or safer.

The third alternative design presented by Strumolo is the steel ball bearing. This alternative, I note, relates not to the pneumatic cylinder itself, but rather to the bearing in the base of the chair. The argument must be that the use of a steel ball bearing reduces the risk that turning the seat will cause the pneumatic cylinder to rotate against the piston and wear out the O-ring. Steelcase switched from a plastic thrust bearing to a steel ball bearing in 1998. Steelcase made that switch based, at least in large part, on its investigation following customer complaints of chair failures. (Vander Zanden Dep. Tr. 35:12-37:10) Those failures, however, related overwhelmingly to slow sinking, not sudden drops. (Breneman Dep. Tr. 102:20-24) Steelcase received only approximately twenty customer complaints regarding sudden drops during the

---

[6]   To exaggerate for purposes of illustration, this is akin to saying that a car would be more crashworthy if it were a truck. An ordinary four-legged steel chair, too, might reduce the risk of dropping, but it would not be adjustable, a feature desired by consumers. Such arguments are precluded by the "utility" component of the risk-utility analysis. *See* n.5, *supra* (enumerating relevant factors).

time it produced some 6 million of these Model 453 Criterion chairs.[7] (*Id.* 52:10-21, 53:13-54:10, 115:23-116:3) Moreover, although the number of complaints fell after Steelcase switched to a steel ball bearing, they did not stop entirely. The new bearing system did not wholly solve the problem, and the O-rings still wore out. (*Id.* 103:4-10) Indeed, Breneman testified that although he has asked the cylinder manufacturers to develop something that would not wear out, "nobody has actually come up with anything." (*Id.* 104:5-12)

In short, the evidence is insufficient to permit a jury inference that there is an alternative, practical, feasible, and safer design that would have prevented this accident. I do not find that the risk of the Model 453 Criterion chairs outweighs their utility, in light of the limited number of complaints and the evidence that nothing can completely prevent O-rings from wearing out over time periods in the range of fifteen years.

For two reasons, then, I will grant summary judgment to Steelcase and SUSPA, and deny it to Strumolo, on the design defect claim. First, the chair had exceeded its useful life, and no inference of a design defect arises from the O-ring having worn out (if that is what happened). Second, there is insufficient evidence that a feasible alternative design would have prevented the accident. In sum, I find that Plaintiffs have failed to establish a prima facie case of design defect and I will grant summary judgment to the Defendants on this claim.[8]

---

[7] The record does not reveal the age or usage patterns of the chairs as to which these twenty complaints were made.

[8] SUSPA argues that the plaintiffs' expert, Mr. Jackson, admitted in his deposition that the design defect was not with the cylinder itself, but that the root cause was a result of the plastic thrust bearing. (Jackson Dep. 96:7-15) Thus, says SUSPA, the design defect claim is against Steelcase only. In response, Plaintiffs contend that the cylinder was jointly designed by SUSPA and Steelcase. That contention overstates the evidence somewhat. Mr. Vander Zanden testified that Steelcase gave SUSPA certain specifications for the cylinder component, including "length of tube and length of rod for the amount of stroke that they want for the chair." (Vander Zander Dep. Tr: 53:23-25) SUSPA then designed and manufactured the cylinder and provided it to Steelcase for integration into the chair's assembly. I would not grant summary judgment to SUSPA on this ground because the cause of the chair's sudden sinking was a worn O-ring, a component supplied by SUSPA, even if it was the relationship between the bearing and the cylinder (an assembly issue) that

### C. Failure to Warn

In a failure-to-warn claim, "the duty to warn is premised on the notion that a product is defective absent an adequate warning for foreseeable users that 'the product can potentially cause injury.'" *Clark v. Safety–Kleen Corp.*, 845 A.2d 587, 598 (N.J. 2004) (quoting *Coffman v. Keene Corp.*, 628 A.2d 710, 716 (N.J. 1993)). The plaintiff must establish (1) a duty to warn, (2) breach of that duty, and (3) that the absence of a warning was the proximate cause of the accident. *See Mendez v. Shah*, 28 F. Supp. 3d 282, 299 (D.N.J. 2014) (citing *James v. Bessemer Processing Co.*, 714 A.2d 898, 907 (N.J. 1998) and *Coffman*, 628 A.2d at 716). The manufacturer may protect itself against a failure to warn claim by selling the product with an adequate warning or, in some cases, by providing one later on:

> [A] manufacturer or seller shall not be liable for harm caused by a failure to warn if the product contains an adequate warning or instruction or, in the case of dangers a manufacturer or seller discovers or reasonably should discover after the product leaves its control, if the manufacturer or seller provides an adequate warning or instruction.

N.J. Stat. Ann. § 2A:58C–4.

Strumolo contends that a duty to warn arose from prior customer complaints and the resulting joint study conducted by Steelcase and SUSPA. As noted above, the number of complaints was relatively small, and they primarily related to slow sinking, not a sudden drop like that experienced by Mr. Strumolo. The sudden-drop complaints amounted to perhaps twenty, out of approximately six million chairs manufactured. The evidence does suggest, however, that Steelcase and SUSPA knew of the piston O-ring wear, and that it was giving rise to malfunctions in the chairs. There is also a suggestion that the slow sinking was a precursor or harbinger of the more sudden collapse. Breneman Dep. Tr. 168:25–169:1) Defendants attempted to address the

---

ultimately caused that wear and tear. In any event, however, the design defect claim fails against both Steelcase and SUSPA for other reasons.

problem by switching to a steel ball bearing that would reduce friction on the piston.

On balance, there is a triable issue of fact as to whether Steelcase and SUSPA had a duty to warn existing customers that their chairs (at least upon attaining a certain age) might suddenly drop. The companies did not recall the legacy chairs with the plastic thrust bearing. It is conceded, moreover, that no warning was affixed to the chairs or provided in any other manner.[9]

The next issue is whether the lack of a warning could reasonably be found to have been a proximate cause of Mr. Strumolo's accident. *Coffman*, 628 A.2d at 716 ("When the alleged defect is the failure to provide warnings, a plaintiff is required to prove that the absence of a warning was a proximate cause of his harm."). New Jersey law has "lightened" a plaintiff's burden in this regard by affording the plaintiff a presumption that had there been a warning, such a warning would have been heeded. *Id.* at 719. To rebut that "heeding presumption," a defendant must present evidence that the plaintiff would have

---

9  Here, Mr. Jackson opined that the defendants should have attached a hanging tag warning to the chair. (Jackson Report p. 6) The proposed tag would contain a picture of the chair with attention drawn to the support column and would read as follows:

WARNING
    CHAIR CAN COLLAPSE
    IF CHAIR SINKS WITHOUT USING THE ADJUSTMENT LEVER:
        - IMMEDIATELY STOP USING CHAIR
        - CONTACT MFR FOR REPAIR OR
        - DISCARD CHAIR

(Jackson Report Ex. B)

The support for that expert recommendation is less than overwhelming. For example, Jackson fails to point to examples of comparable warnings attached to any other manufacturer's similar chairs. *See Jackson v. Target Stores*, 2008 WL 2788066, at *4 (N.J. Super. Ct. App. Div. July 21, 2008). The issue is, however, one of weight or credibility.

Steelcase and SUSPA point to deposition testimony from Jackson in which he concedes that a hanging tag would be removed shortly after purchase and would not likely have remained on the chair for its fifteen year life. (Jackson Dep. Tr. 84:7-10) This perhaps places too much emphasis on the particular kind of tag used; a warning could effectively be conveyed in any number of ways. Mr. Jackson would put the onus on the employer to convey the information on the warning to subsequent users of the chair. (*Id.* 83:25-84:6)

disregarded the warning, if it had been provided. *Id.* at 720-21 ("Evidence that a plaintiff would have disregarded an adequate warning would tend to demonstrate that the plaintiff's conduct, rather than the absence of a warning, was the cause in fact of the resultant injury."); *see Calderon v. Machinenfabriek Bollegraaf Appingedam BV*, 667 A.2d 1111, 1117 (N.J. Super. Ct. App. Div. 1995) (manufacturer not liable because any given warnings would not have been heeded). In cases involving products used in the workplace, "the manufacturer must show that had an adequate warning been provided, the employer itself would not have heeded the warning by taking reasonable precautions for the safety of its employees and would not have allowed its employees to take measures to avoid or minimize the harm from their use or exposure to the dangerous product." *Coffman*, 628 A.2d at 724.

Mr. Strumolo affirms that had a warning been placed on the chair, he would have heeded that warning. As to a potentially collapsing chair, that is not a wholly implausible contention. Steelcase and SUSPA, however, submit that they have presented evidence to rebut the presumption, and they do have facts to work with. Dish Network simply took over these old chairs from the prior tenant. Deposition testimony revealed that employees could select any chair they wanted, including, if they chose, a discarded or broken chair. Employees were also supposed to report broken chairs to supervisors and maintenance, but there is no indication that chairs were retired on any particular schedule. In short, the evidence would not permit summary judgment either way. Genuine issues of material fact are raised as to whether Dish Network, or Mr. Strumolo himself, would have heeded a warning.

Accordingly, both sides' motions for summary judgment are denied as to the failure to warn claim.

## CONCLUSION

For the reasons set forth above, the motions for summary judgment are granted in part and denied in part. Plaintiffs' motion is denied in its entirety; The motions of Defendants Steelcase and SUSPA are denied as to the failure to warn claim but are granted on the design defect claim. An appropriate order follows.

Dated: August 26, 2016

_____
HON. KEVIN MCNULTY, U.S.D.J.